UNITED STATES of America

v.

Samuel W. HARRIS, Appellant.

No. 72–2093.

United States Court of Appeals,
Third Circuit.

Argued April 3, 1973.

Decided July 31, 1973.

David O'Hanesian, Pittsburgh, Pa., for appellant.

Richard L. Thornburgh, U. S. Atty., Jay C. Waldman, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before ROSENN and HUNTER, Circuit Judges, and BECHTLE, District Judge.

## OPINION OF THE COURT

BECHTLE, District Judge.

Appellant stands convicted of possession of a controlled substance, cocaine residue, in violation of 21 U.S.C. § 844. A verdict of guilty was returned by a jury on September 29, 1972. After a motion for a new trial was denied, appellant was sentenced to a term of one year and fined $4,000. This appeal followed. For purposes of this appeal, the operative facts are as follows:

Upon information provided by informants, whose information had proved reliable in the past, and also surveillance by agents of the New York and Pittsburgh Offices of the Bureau of Narcotics and Dangerous Drugs ("BNDD"), appellant Harris was known to be a large-scale narcotics trafficker with a prime source of supply in New York City.[1]

As a result of information accumulated by agents of the BNDD, a pattern of travel on the part of Harris was established. Approximately every two weeks, appellant would travel to New York City; and within several days following his return to Pittsburgh, his home base, a courier would arrive at Pittsburgh with a supply of narcotics. On December 3, 1971, while under surveillance by the BNDD, Harris boarded a flight from the Pittsburgh Airport, leaving his car at the place of departure. On December 6, 1971, upon receipt of information that appellant had returned at the Pittsburgh Airport, surveillance by BNDD agents was continued.

At approximately 8:00 p. m., on Saturday night, December 11, 1971, appellant was observed sitting in his car at a Boron service station with one Bruce Wander. At that time, the BNDD agents were aware of Wander's involvement with Harris in narcotics activities. When Harris observed the agents, he executed an illegal turn from the service station and eluded the surveillance team.

The following morning, Sunday, December 12, 1971, at approximately 6:00 a. m., appellant was seen again, this time leaving his car and entering his residence with two females. While a surveillance plan was being prepared, the Harris vehicle left the residence unnoticed by the agents. Shortly after 6:30 a. m., Harris' position was again located. He was driving his car with three unidentified persons on Penn Avenue in Wilkinsburg. Realizing he had been recognized by a narcotics agent that knew him, appellant accelerated his vehicle and made a quick right-hand turn onto a cross street. He was recognized a second time and accelerated and turned off to a cross street. Several minutes later, Bruce Wander was observed walking in an alleyway located behind the service station in which the two men had been observed the previous night. Wander entered his car, drove into the intersection of Swissvale and Penn Avenues in what appeared to be a confused state, made a hurried turnabout, and proceeded illegally through two traffic lights. As the Wander vehicle drove north on Swissvale Avenue, appellant drove south on Swissvale flash-

---

1. Certain of his activities refer to "Pittsburgh" and other evidentiary matters refer to "Wilkinsburg." Wilkinsburg is a contiguous adjoining municipality of Pittsburgh and there seems to be little question but that the activities important to this appeal took place essentially in the same neighborhood or vicinity.

ing his headlights on and off and blowing his horn. Wander was traveling approximately 45 miles an hour and made a hard turn onto a side street. Harris then turned his vehicle around and attempted to follow the Wander car. Special Agent Edward H. Sheid of the BNDD, who was in charge of the surveillance team, gave instructions to stop the vehicles, and Harris and the other occupants of the car were arrested. Richard C. Weatherbee, another of the arresting officers, testified that when Harris got out of his car and when he was within one foot of Harris he saw white powder around a nostril of Harris' nose. Government witness Robert Lumsden, a BNDD agent, schooled and trained in pharmacy and the identification and properties of drugs, testified that cocaine is commonly used by "snorting it" by sniffing it from a small spoon. A Government chemist testified that the spoon seized in the car Harris was driving contained a residue of cocaine. A Pittsburgh jewelry retailer was called by the Government, and he testified that the spoon had been sold by him and, while he could not identify Harris as the person who bought that very spoon, he did identify Harris as a person who had visited his store and purchased spoons just like the one that was seized.

Appellant's initial contention on appeal is that the facts of this particular case preclude a finding of sufficient probable cause to make a warrantless arrest. Title 26, U.S.C. § 7607, in effect at the time of appellant's arrest, specifically authorized a warrantless arrest by narcotics agents when an offense is being committed in their presence or when the agents have reasonable grounds to believe that the person to be arrested has or is committing a violation relating to narcotic laws.[2]

Although 26 U.S.C. § 7607(2) spoke in terms of "reasonable grounds" rather than the traditional formulation of probable cause, the two standards have been held substantially equivalent. Draper v. United States, 358 U.S. 307, 310 n.3, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Davis, 461 F.2d 1026 (3rd Cir. 1972). Therefore, the traditional Fourth Amendment test applies even to arrests conducted under the authority of the foregoing section.

■ Probable cause to make an arrest varies with the circumstances and must be founded on facts sufficient in themselves. United States v. Lampkin, 464 F.2d 1093 (3rd Cir. 1972). The court in *Lampkin*, at 1095, reaffirmed the well-established constitutional precept initially enunciated in Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L. Ed.2d 142 (1964), that in passing on a warrantless search a court must determine whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the petitioner had been or was committing an offense."

■ It is, therefore, the function of this Court to examine the totality of circumstances—the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest of the appellant—to determine if the constitutional standard of probable cause was met.

Prior to the appellant's arrest, he was under surveillance by agents of the BNDD. Through information received from reliable informants and surveillance conducted by the Federal agents, appellant Harris was known to be a relatively large dealer of narcotics in the Pittsburgh area. The agents of the BNDD were aware of appellant's pattern of travel to and from the Pittsburgh Airport and were even cognizant of the details relating to the cutting and packaging of the narcotics by Harris'

---

2. Title 26, U.S.C. § 7607 has since been supplanted by Title 21, U.S.C. § 878.

associates for the purpose of further distribution and sale.

The surveillance of Harris revealed that he was often in the company of individuals known by the Federal agents to be actively involved in the sale of narcotics. As outlined above, appellant was observed sitting in an automobile with Bruce Wander, the reputed financial supporter of the drug operation, the night before his arrest.

Although mere association and consorting with drug traffickers does not give rise to probable cause in and of itself, United States v. Lampkin, *supra*, 464 F.2d at 1097, other interrelated factors that justify a reasonable inference that a crime has been or was being committed are present in the instant case.

In view of the appellant's behavior on the night of December 11, 1971, and the following Sunday morning, to which we have previously alluded, the Federal agents were justified in stopping the vehicle driven by Harris on a public street in Wilkinsburg and arresting him.

■ When the knowledge and reliable information possessed by the agents involved in this case is superimposed upon the events immediately preceding the arrest of the appellant, sufficient probable cause to make a warrantless arrest is present. The arrest of the appellant was not an unjustified harassment or unreasonable intrusion into his personal business. His arrest was based on reliable information furnished by reliable informants, supported by eyewitness corroboration resulting from coordinated surveillance activities, and immediately preceded by a sequence of unlawful and highly suspicious behavior. These factors, when viewed in their totality, afford the necessary probable cause to believe that appellant Harris was violating the narcotics laws at the time of his arrest.

Following the arrest of the appellant, as previously described, the automobile in which he was driving was driven to the basement of the Federal Building in Pittsburgh, a secured area. At that time, agents of the BNDD applied for a search warrant for the vehicle, which was issued forthwith by a United States Magistrate on duty in the Federal Building. The search of the automobile uncovered a small gold spoon, later revealed to be owned by the appellant, on which a residue of cocaine was found.

■ The appellant now contends that the affidavit upon which the search warrant was issued did not establish probable cause and that the evidence found during its execution should not have been admitted against him at trial. Since the inquiry into the existence of probable cause is limited to those facts contained in the affidavit, our analysis must be confined to the affidavit which the magistrate acted upon.

The standards by which an affidavit must be tested are set forth in Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The thrust of the decision in *Aguilar* is that when probable cause is established through information supplied by an informant, as was the case here, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the appellant was engaging in unlawful activity, and some of the underlying circumstances from which the officer (affiant) concluded that the informant was credible or his information reliable.

The first element of the two-pronged *Aguilar* test is satisfied by the inclusion in the affidavit of the description in detail of the structure and operation of the appellant's narcotics enterprise. The affidavit contained information concerning the scope of appellant's illicit activities, the identity and location of the primary source of the narcotics, and the name and address of the financial backer. The magistrate was also furnished in the affidavit the information to the effect that the confidential informants had personally observed unlawful activities on the part of Harris, had over-

heard telephone conversations concerning the purchase and transportation of the drugs, and that one of the informants was actively involved in the Harris narcotics organization.

The basis of the affiant's conclusion that the informant was credible or his information reliable (the second prerequisite of the *Aguilar* test) consists in the corroboration of the information by independent investigation and observation by the agents of BNDD. Additional corroboration of the information occurred by virtue of substantially identical information being supplied by different informants and other law enforcement agencies.

The affidavit for the warrant also described in detail the evasive action engaged in by the appellant in the time period immediately prior to his arrest. In view of the above, the affidavit clearly establishes that there was sufficient probable cause for the issuance of the search warrants.

■■ Appellant's final contention on appeal is that the information upon which the search warrant issued was stale. The law is well founded that probable cause to justify the issuance of a search warrant must exist at the time the warrant is issued. United States v. Boyd, 422 F.2d 791 (6th Cir. 1970). The question of the staleness of probable cause depends more on the nature of the unlawful activity alleged in the affidavit than the dates and times specified therein. As noted in United States v. Johnson, 461 F.2d 285 (10th Cir. 1972) at 287:

"Initially, it should be noted that the validity of probable cause cannot be qualified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."

■ The arrest of Harris did not occur until such a time as the information supplied by the informants and the surveillance conducted by the BNDD agents materialized. Protracted and continuous activity is inherent in a large-scale narcotics operation. All the events establishing probable cause will not necessarily occur a few hours or even a few weeks before the affidavit for a search warrant is issued. Effective law enforcement, specifically in the area of far-flung or transcontinental narcotic networks, should not be undermined by making the application of rigid time sequence requirements when the effect of the passage of time between initial recognition of likely unlawful activity, and the application for a search warrant is tested. The issue as to whether or not information in an affidavit is stale must depend upon the nature of the activity in question and usually will require review on a case-by-case basis.

■ We do not believe that the information supplied by the informant was stale; but on the contrary, it is fair to conclude that it had not fully ripened for action until December 12, 1971.

The Government contends that, regardless of the validity of the search warrant, the search, nevertheless, would be valid for the reason that a lawful warrantless search could have been conducted under the circumstances of this case. The Government cites Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) as precedent. In *Chambers,* police stopped an automobile on the highway and arrested four occupants of the vehicle as suspects in a robbery that had just occurred in the vicinity of the arrest. The four men and the automobile matched a description of the robbers which was broadcast over the police radio. The car was driven to

the police station and a warrantless search was conducted. Incriminating evidence was discovered and used at the trial, at which the defendants were convicted. The United States Supreme Court upheld the warrantless search and stated:

"For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U.S. at 52, 90 S.Ct. at 1981.

The reasoning of the Supreme Court applies equally to this case.

In United States v. 1964 Ford Thunderbird, Motor and Serial Number 4Y85Z156657, 445 F.2d 1064 (3rd Cir. 1971),[3] our Circuit recited the language of the United States Supreme Court in the case of Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), involving a moving vehicle and contraband wherein a warrantless arrest of the driver and search of the vehicle occurred. The Supreme Court said as follows:

"In (a moving vehicle case) the citizen who has given no good cause for believing he is engaged in (transporting contraband) is entitled to proceed on his way without interference. But one who recently and repeatedly has given substantial ground for believing that he is engaging in the forbidden transportation in the area of the usual operations has no such immunity, if the officer who intercepts him in that region knows that fact at the time he makes the interception and the circumstances under which it is made are not such as to indicate the suspect is going about legitimate affairs. 338 U.S. at 177, 69 S.Ct. at 1311."

The *1964 Ford Thunderbird* case was, like the instant case, one involving surveillance by narcotics agents in a continuing investigation and involved, as in the instant case, motor vehicles under surveillance, the suspected automobile going through red lights, making U-turns, traveling at fluctuating rates of speed, and leaving and returning to the scene of the primary surveillance.

The judgment of the United States District Court for the Western District of Pennsylvania will be affirmed.

3. Cert. denied, 405 U.S. 964, 92 S.Ct. 1181, 31 L.Ed.2d 239.